UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Wildlife Research Center, Inc.,

        Plaintiff,

v.

HME Products, LLC and
Terry A. Harmston,

        Defendants.

Civil File No.  06-CV-03745 (MJD-SRN)

## PLAINTIFF'S MEMORANDUM
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT OF NONINFRINGEMENT, AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT OF CLAIMS 1 AND 7

### INTRODUCTION

As defendants' motion implicitly recognizes, this patent case turns on a single issue:  whether the container of defendants' Seal-Tite Drop Wick product "protects the wick from falling moisture."[1]  Defendants seek summary judgment, arguing that the Seal-Tite Drop Wick's container "provides *no protection* for the scent wick from falling moisture."  <u>See</u> Defs. Mem., p. 16; <u>see also</u> at p. 15 ("container offers *no protection* for the wick. . .") (emphasis added).

Defendants' motion is based on two fundamental errors.  First, while defendants do not propose a specific claim construction of the word "protects", defendants' position is implicitly based on a claim construction that would interpret the term "protects" to

---

[1]  Defendants have not filed an answer.  This single infringement defense is thus the only defense asserted in response to Wildlife Research's complaint.

require the container to *eliminate* all moisture from touching the wick. Second, with respect to infringement, defendants claim that the container offers "no protection" to the wick. That claim is based entirely on a test conducted by Environ Laboratories that involved wholly unrealistic conditions, and that did not make any attempt to compare the performance of wicks suspended under the Seal-Tite Drop Wick container with bare, unprotected wicks.

Defendants are demonstrably wrong on both claim construction and infringement. Wildlife Research is entitled to a claim construction that reflects the full scope of the ordinary meaning of the word "protects". The ordinary meaning of "protects" is to "cover or shield", and certainly does not require that the container completely eliminate all moisture from falling on the wick. Second, as demonstrated by the testing performed by Wildlife Research's independent expert, William Welbes, defendants' Seal-Tite Drop Wick container provides a significant, measurable level of protection to the wick. Defendants' motion to dismiss and for summary judgment should therefore be denied.

Wildlife Research has also filed a cross-motion for summary judgment of infringement of Claims 1and 7 of the '668 patent. When infringement is analyzed using the proper claim construction, Mr. Welbes' testing establishes beyond any legitimate factual dispute that the defendants' container does indeed protect the wick from falling moisture. The remaining claim elements of claims 1 and 7 are easily and obviously met by the defendants' product. There is thus no need in this case for lengthy patent litigation, and Wildlife Research respectfully requests that the Court grant summary judgment that defendants infringe Claims 1 and 7 of Wildlife Research's '668 patent.

<u>**STATEMENT OF THE CASE**</u>

**I.     BACKGROUND OF THE INVENTION**

Wildlife Research is a Minnesota company founded by two brothers, John and Brian Burgeson.  Burgeson Dec. ¶ 2.  Wildlife Research makes and sells a wide variety of animal attractant scents, scent dispensers, masking agents and related products used in hunting deer and other large game animals.  <u>Id.</u>, ¶ 3.  Deer hunters use scents to attract deer to a particular area.  For example, a hunter may place a scent containing doe urine with doe estrus near his or her deer stand, in order to attract a buck sensing a presence of a doe into the area.  <u>Id.</u>, ¶ 4.

Before the inventions claimed in Wildlife Research's '668 patent, there were a variety of wick products used for dispersing scent on the market.  *See* Burgeson Dec., ¶ 5 and Exs. 1-2.  The use of bare, unprotected wicks coated with scent was, and is, a common practice.  <u>Id.</u>  There were also wick products that came in containers of various types.  <u>Id.</u>  However, there were no products on the market that had the container hanging above the wick to protect the wick.  <u>Id.</u>

John Burgeson, one of Wildlife Research's co-founders, came up with the novel idea of combining a reusable wick and a container, with the container hanging above the wick to protect the wick from falling moisture.  <u>Id.</u>, ¶ 6.  Mr. Burgeson's concept was that his invention would allow the wick to work longer by keeping rain, or moisture from melting snow, from washing the scent off the wick.  This would allow the hunter to have a more effective hunt for a longer period of time, even in rainy or snowy conditions.  <u>Id.</u>  Moreover, some hunters consider the scents to be smelly and messy.  Having the wick hang down from a container, as described in Mr. Burgeson's invention, allows the hunter

to easily pop the wick back into the container, to carry the wick in a pocket or bag, and to reuse the wick, all without having to touch the wick or have scent get on the hunter or his or her clothing.  Id.

Wildlife Research has sold products based on Mr. Burgeson's invention since 2000.  Burgeson Dec. ¶ 7 and Ex. 3.  The products have been a commercial success for the company.  Id.

## II.    THE '668 PATENT AND PROSECUTION HISTORY

Mr. Burgeson applied for the '668 patent on November 4, 1999, and the patent issued on December 12, 2000.  Claim 1 is representative of the claims of the patent, and provides as follows:

> 1.  A reusable hanging container and scent wick therefore for attracting big game, comprising:
>
> a) the container having a closed end with hanging means for supporting the container above the ground;
>
> b) an opening into the container with a cap to sealably close the container; and
>
> c) a scent wick for receiving a big game scent, the wick being of a size to fit within the container and to permit sealing of the container with the cap; an[d]
>
> d) wherein the opening is on a bottom of the container and the scent wick is shaped to permit a substantial portion of the wick to fall out of the container to expose the scent wick while the container above protects the wick from falling moisture.

Peter Nikolai Aff., Ex. A.

The prosecution history of the '668 patent does not contain any statements from the patentee or the Patent Office that narrow the ordinary meaning of the claim term

"protects." As defendants point out, claim 1 as originally filed did not contain the "protects" limitation; that limitation was contained in other independent claims and in a dependent claim then numbered as claim 2. Nikolai Aff., Ex. B. On June 9, 2000, the patent examiner rejected claim 1 as being anticipated by the Beck Patent and the Fisher Patent. Id. Neither the Beck Patent nor the Fisher Patent discloses a container disposed above a wick to protect the wick from falling moisture; indeed, none of the prior art has that feature. *See* Nikolai Aff., Exs. C-Q. Consequently, the patent examiner indicated that claim 1 would be allowed if the "protects" limitation from dependent claim 2 were incorporated in claim 1. Nikolai Aff., Ex. B.

Following the patent examiner's suggestion, Wildlife Research subsequently amended claim 1 to incorporate dependent claim 2's "protects" limitation. The wording of the "protects" limitation was not changed. Moreover, Wildlife Research did not make any statements, at that time or at any point in the prosecution history, narrowing the meaning of the "protects" limitation. Neither did the patent examiner.

The specification of the '668 patent describes three preferred embodiments. *See* Nikolai Aff. Ex. A, Cols. 2-3 and Figs. 1-4. Two of them, shown in Figs. 1-2, disclose containers disposed above wicks, with wicks that appear to largely fill the openings in the containers. Both of those preferred embodiments provide protection from falling moisture by having a container above the wick, but would not eliminate all falling moisture from hitting the wick. *See* Nikolai Aff. Ex. A, Figs. 1-2. The third embodiment is structurally different, as it has the wick disposed underneath folding panels which the patent refers to as "doors." Id., Figs. 3-4 and Col. 3 l. 42.

The patent specification also repeatedly uses the term "protects" in an ordinary fashion, without indicating any intent to change that word's ordinary meaning to "eliminate." *See* Nikolai Aff., Ex. A (Abstract; Col. 1 l. 40-44; Col. 1 l. 50-51; Col. 1 l. 63-67; Col. 3 l. 42). For example, the passage distinguishing the prior art at Col. 1, l. 40 states:

> However, many such prior art dispensers are complicated or simply do not protect the scent wick from harsh weather conditions, including wind, rain and snow, which will significantly affect the effectiveness of the scent dispersion.

That use of "protect", with its reference to "wind, rain and snow", is a further indication that protect has its ordinary meaning, as no one would read the patented inventions shown in the '668 patent as *eliminating* the effect of "wind" on scent dispersion.

Finally, the specification also notes that "*another* object and advantage of the present invention is that the hanging container protects the scent wick from above to eliminate moisture from falling onto the scent wick, which would otherwise dilute the animal scent on the wick." Id., Col. 2 l. 15-19 (emphasis added). This use of the word "eliminate" is used in reference to *one* of the recited advantages. This sentence does not state that all embodiments require the "elimination" of moisture. No such statement is made or suggested in any part of the patent specification.

## III.    DEFENDANTS' COMPETING PRODUCT

During the summer of 2006, Wildlife Research became aware of defendants Seal-Tite Drop Wick product. J. Burgeson Dec., ¶ 8. The defendants' Seal-Tite Drop Wick product is essentially a copy of Wildlife Research's successful commercial products that are based on the '668 patent. *Compare* Burgeson Dec. Ex. 3, depicting Wildlife

Research's commercial products, with Ex. 4 and Harmston Aff. Ex. B, the Seal-Tite Drop Wick product. The defendants' product contains all of the elements of Claims 1 and 7 of the '668 patent. *See* Burgeson Dec. Ex. 4, and *compare* Harmston Aff. Ex. B, the Seal-Tite Drop Wick product, to Claims 1 and 7 of the '668 patent. The Seal-Tite Drop Wick product:

- Is a reusable hanging container and scent wick

- Has a container with a closed end with hanging means for supporting the container above the ground

- Has an opening into the container located on the bottom of the container

- Has a cap to sealably close the container

- Has a scent wick sized to fit within the container

- Has a scent wick shaped to permit a substantial portion of the wick to fall out of the container to expose the scent wick

- Has a container disposed above the scent wick to protect the wick from falling moisture

*See* Burgeson Dec. ¶ 9 and Ex. 4; *see* Welbes Dec. ¶¶ 22-24, 31 and Exs. 2-5 (demonstrating container protects wick from falling moisture).

## IV.  RAIN TESTING OF DEFENDANTS' SEAL-TITE DROP WICK PRODUCT

### A.  The Environ Testing Submitted by Defendants

Defendants submitted, via Mr. Harmston's Affidavit, the results of rain testing performed by Environ Laboratories ("Environ"). The tests consisted of two tests of a Seal-Tite Drop Wick product under what defendants refer to as a "fine mist" and one test under a "Drip Box." *See* Harmston Aff. and Ex. C.

The tests were designed and conducted by Dan Larson, a senior test technician at Environ. Vitt Dec. Ex. 2 (Larson Dep. p. 6). Mr. Larson has a two-year technical degree in vibration and acoustics. Id. (Larson Dep. p. 8). Mr. Larson had never designed a rain test before this case. Id. (Larson Dep. p. 8-9). Mr. Larson does have experience turning on the water and monitoring the equipment for rain testing designed by others. Id.

Wildlife Research's expert, William Welbes of Legend Technical Services, has decades of experience designing and conducting scientific testing, including many tests involving the effects of rain or precipitation on various products. Welbes Dec. ¶ 2. Mr. Welbes reviewed the Environ testing, and concluded that the Environ testing had several serious flaws, including:

1) The rates of rainfall were extreme and not reflective of realistic hunting conditions. The "fine mist" test was at 3.65 inches of rain per hour, and the "Drip Box" test was at a rate of 11.02 inches per hour. Mr. Larson admitted that he made no attempt to approximate realistic conditions in his testing. Vitt Dec. Ex. 2 (Larson Dep. p. 75-76).

2) There was no effort to compare the Seal-Tite Drop Wick product to a bare wick product. Mr. Larson testified that there was no discussion of doing a comparison. (Larson Dep. p. 16).

3) Only three units were tested, so no meaningful empirical data was generated.

4) The Environ testing relied solely on visual observation, with no measurements taken of anything relating to the wick. Therefore, all that can be determined for sure from the testing is that, under the particular conditions of the tests, some amount of water ended up on the wicks. It is not known how much water ended up on the wicks, nor is it known how much scent material was lost. Mr. Larson testified that there was no consideration given to measuring the amount of scent remaining on the wicks or the amount of water on the wicks. (Larson Dep. pp. 17-18, 46, 50-51, 69).

See Welbes Dec. ¶ 33.

### B. Testing Conducted by William Welbes

Wildlife Research asked William Welbes, Laboratory Director and Vice President of Legend Technical Services, to design and conduct testing to determine whether the defendants' Seal-Tite Drop Wick container protected the wick from falling water. Welbes Dec. ¶¶ 1-3. Mr. Welbes designed and conducted two tests simulating rainfall conditions and their effect on the Seal-Tite Drop Wick: 1) testing to compare the amount of water taken up by a bare wick as compared to a wick under the Seal-Tite Drop Wick's container; and 2) testing to compare the amount of scent lost by a bare wick as compared to a wick under the Seal-Tite Drop Wick's container.

Mr. Welbes based his testing on realistic rainfall rates, after analyzing the rainfall rates prevailing during hunting season. Welbes Dec. ¶¶ 6-7 and Ex. 6. Mr. Welbes found that hourly rainfall (when rain is occurring) ranges from 0.01 inches per hour to 0.3 inches per hour, with rainfall rates greater than 0.3 inches per hour a rare occurrence. Id. Mr. Welbes constructed a rainfall simulator to pattern those realistic rainfall conditions, and placed brush under the rainfall simulator to mimic real-life conditions. Welbes Dec. ¶¶ 8-11.

For the comparison of water weight gain, Mr. Welbes conducted six trials. Most of the trials involved 16 bare wicks and 16 protected wicks. The bare and protected wicks were randomly placed in the brush beneath the rainfall simulator, and subjected to approximately one hour of rainfall at rates from 0.2 inches per hour up to 1.26 inches per hour. Welbes Dec. ¶¶ 12-24. After the testing, the wicks were removed and re-weighed to determine the amount of water weight gained by the bare wicks and the protected wicks.

Mr. Welbes' testing demonstrated that the Seal-Tite Drop Wick container provides a significant level of protection to the wick, as the bare wicks gained dramatically more weight than the wicks protected by the container. For example, at 0.31 inches/hour, the bare wicks gained an average of 26.4% (a 0.75 gram average increase) of their original weight in water, over ten times the amount gained by the protected wicks, which gained only 2.1% (a 0.06 gram average increase). Welbes Dec. ¶ 22 and Exs. 2-3.

At all rainfall levels tested, the protected wicks significantly outperformed the bare wicks. *See* Welbes Dec., Exs. 2-3. On average, at 0.2 and 0.28 inches, the bare wicks gained 8-10 times as much water weight. At 0.43 inches/hour, on average the bare wicks gained 23.19% (0.67 gram average increase) compared to 6.47% (0.18 gram average increase) for the protected wicks, roughly four times as much weight. Welbes Dec. ¶ 23.

At more severe rainfall levels of 0.79 inches/hour and 1.26 inches/hour, conditions which the data shows are unusual for hunting season and in which a hunter is unlikely to be using the product, *see* Burgeson Dec. ¶ 11, the differences were still very significant. For the 0.79 inch/hour trial, the bare wick gained 45.18% (1.17 gram average increase) to 7.32% (0.20 gram average increase) for the protected wick, a six-fold difference; while for the 1.26 inch/hour trial, the bare wick gained 51.22% (1.5 gram average increase) to 21.31% (0.61 gram average increase) for the protected wick. Welbes Dec. ¶ 24 and Exs. 4-5.

The testing of the amount of scent lost by the wicks achieved similar results. In this test, the wicks were dipped in a commercially available scent product, and then weighed before testing to determine how much scent material was on each wick. Welbes Dec. ¶ 25. Bare and protected wicks were then subjected to an hour of rainfall at a rate of

0.3 inches per hour.  The wicks were then removed, and the amount of remaining scent material was analyzed using Gas Chromatography-Mass Spectrometry.  Mr. Welbes could not simply re-weigh the wicks to determine the amount of scent remaining, because that would not account for how much weight in water had been added to the wicks. Welbes Dec. ¶ 30.

This testing showed a similar dramatic advantage in the protection offered by the Seal-Tite Drop Wick container.  On average, the bare wicks lost 73.7% of the scent material by weight, while the wicks protected by the Seal-Tite Drop Wick container lost only 12.6% (control wicks not subjected to rainfall lost 4.4% of the scent material due to normal evaporation).  Welbes Dec. ¶ 31 and Exs. 4-5.

## ARGUMENT

## I.      THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS

Defendants have styled their motion as a motion to dismiss, or in the alternative, a motion for summary judgment.  There is no question, however, that defendants' motion can only be analyzed as a motion for summary judgment.  The substance of a motion controls, not the form.  BBCA, Inc. v. United States, 954 F.2d 1429, 1431-32 (8th Cir. 1992); In re Nash Finch Co. Securities Litigation, 338 F. Supp. 2d 1037 (D. Minn. 2004).

Defendants have made no effort to confine themselves to the allegations of the complaint, as required on a motion to dismiss; indeed defendants do not even attempt to argue that the allegations of Wildlife Research's complaint are insufficient under Fed. R. Civ. P. 12(b)(6).  Instead, defendants submit factual materials going far beyond the four corners of the complaint to try to prove their disputed (and incorrect) factual contention that "the container offers no protection for the wick."

Defendants' filing of a motion to dismiss, and their failure to answer, is a transparent effort to forestall normal pretrial procedures, including the entry of a scheduling order and the beginning of normal discovery. Defendants' motion to dismiss is improper, and should be rejected.[2] Plaintiff respectfully requests that the Court order defendants to file an answer immediately, so that the ordinary pretrial process can begin.

## II. THIS COURT SHOULD CONSTRUE THE TERM "PROTECTS" TO HAVE ITS ORDINARY MEANING OF "TO COVER OR SHIELD"

### A. The Law of Claim Construction

This Court is familiar with the principles of claim construction, which have recently been reemphasized by the Federal Circuit in Phillips v. AWH Corp., 415 F.3d 1303, 1303 (Fed. Cir. 2005 *en banc*), and many of the basic principles are set forth in defendants' opening brief at pp. 11-13. Some of the basic principles, however, deserve particular emphasis here.

First, the claim terms are to be interpreted from the point of view of the person of ordinary skill in the art. The Court's task here, therefore, is to determine what the ordinary hunter, reviewing the intrinsic evidence relating to this patent, would understand the term "protects" to mean. Id. at 1312-13.

---

[2] Defendants cite General Mills, Inc. v. Kraft Foods Global, Inc., Civ. No. 05-1253 (JNE/JJG), 2006 U.S. Dist. LEXIS 44507, *5 (D. Minn. June 28, 2006), arguing that that case involved the dismissal of a complaint on noninfringement grounds. The General Mills case has not changed the time-honored rules established by Fed. R. Civ. P. 12(b)(6) and 56. Instead, in that case, the plaintiffs' suit was found to be barred under the terms of a settlement agreement.

Second, the claim language itself, the specification, and the file history—together, the "intrinsic evidence"—are the primary guides to claim meaning. Id. at 1315-1317. Defendants acknowledge, as they must, that it is the claim language that defines the scope of the claim. Id. As the Phillips court said: "it is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Id. at 1312; see also Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001).

Third, as defendants also acknowledge, the words of a claim are normally given their ordinary and customary meaning. Defs. Mem., p. 11. As the Federal Circuit has recently stated, "generally speaking, we indulge a strong presumption that a claim term carries its ordinary and customary meaning." Deering Precision Instruments v. Vector Distributing Sys., 347 F.3d 1314, 1322 (Fed. Cir. 2003). As a result, "absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning." Elekta Instruments, S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000).

Fourth, the meaning of the claim terms is to be determined in light of the specification and the file history, and the Phillips court has recently re-emphasized the importance of the specification as the "single best guide" to the meaning of a disputed claim term. Phillips, 415 F.3d at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). One particularly important aspect of the specification's role relates to the "preferred embodiments" described in the specification. As the Federal Circuit has repeatedly made clear, a claim construction that excludes a preferred embodiment is "rarely, if ever correct" and any such construction requires "highly persuasive evidentiary support." Vitronics, 90 F.3d at 1583.

### B. Wildlife Research is Entitled to the Full Scope of the Ordinary Meaning of the Term "Protects"

Plaintiff Wildlife Research contends that the term "protects" should be given its ordinary meaning, "to cover or shield." See Vitt Dec. Ex. 1 (Merriam-Webster definition of "protect"). Defendants do not specifically call out a precise definition of the term "protects" in their memorandum. Instead, at times they seem to say only that "protects" means "protects" and is a required element of the claims, a point which is not in dispute. *See* Defs. Mem., p. 11 (heading), see also p. 13-14. However, at other times their position seems to be that the term "protects" means that the container must "eliminate" moisture from falling on the scent wick. See Defs. Mem., p. 1, p. 14. Moreover, that position is implicit in their infringement argument, which is based on the theory that if moisture is detected on the wick, then the container has provided "no protection."

Fundamental principles of patent law require that the Court accept Wildlife Research's construction and reject defendants' construction. Wildlife Research is entitled to the full scope of the ordinary meaning of the term. The Federal Circuit has repeatedly made clear that "unless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as understood by an artisan of ordinary skill." Rexnard Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001); see also Free Motion Fitness v. Cybex Intern., 423 F.3d 1343, 1348 (Fed. Cir. 2005); Gillette v. Energizer Holdings, 405 F.3d 1367 (Fed. Cir. 2005).

Courts will depart from the full scope of the ordinary meaning in one of three circumstances. First, the courts can narrow the ordinary meaning of a claim term using the doctrine of prosecution history disclaimer. For prosecution history disclaimer to

apply, the patentee must have made a statement in the prosecution history that constitutes a "clear and unambiguous" disavowal of claim scope. Seachange International v. C-Cor, Inc., 413 F.3d 1361, 1373 (Fed. Cir. 2005). Although defendants make reference to the amendment of claim 1 to include the "protects" limitation, this doctrine clearly does not apply. There is no statement in the prosecution history, let alone a "clear and unambiguous" one, that narrows the ordinary scope of the word "protects."

Second, if the patentee has explicitly redefined a claim term in the specification, then that explicit definition governs. Teleflex v. Ficosa N. Amer. Corp., 299 F.2d 1313, 1327 (Fed. Cir. 2002). That is not the case here, and defendants do not argue that Wildlife Research's patent gives an explicit, narrowing definition of the term "protects."

Third, the courts will narrow the ordinary meaning of a claim term if the patentee has characterized the invention in the patent specification using words or expressions of "manifest exclusion or restriction, representing a clear disavowal of claim scope." Id.; see also Fiber Optic Design v. Seas. Spec. LLC, 172 Fed. Appx. 995 (Fed. Cir. 2006) (reversing a decision by Judge Kyle finding a disavowal of claim scope in the specification). Defendants apparently rely on this doctrine, citing repeatedly to a single sentence in the specification that states that *one* of the objects and advantages of the invention "is that the hanging container protects the scent wick from above to eliminate moisture from falling onto the scent wick." '668 Patent, Col. 2 l. 17-19.

This single statement does not come close to the kind of "clear disavowal" of claim scope required to narrow the ordinary meaning of "protects." Merely referring to one aspect, or one advantage, of an invention is not sufficient; instead the disclaimer language must make clear that all embodiments must have such a narrow scope.

Compare Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1301-02 (Fed. Cir. 2003) ("The objective described is merely one of several objectives that can be achieved through the use of the invention; the written description does not suggest that the invention must be used only in a manner to attain that objective.") and Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346 (Fed. Cir. 2003) (finding no disclaimer because specification "states one of several objectives that can be achieved through the use of the invention; it does not suggest that the invention must always be used in a manner that achieves that invention) with SciMed Life Sys. v. ACS, 242 F.3d 1337 (Fed. Cir. 2001) (specification's narrowing language explicitly applied to "all embodiments").

Defendants' own cases show the kind of clear evidence—not present here—required to find a disavowal of claim scope in the specification. For example, in On Demand Machine Corp v. Ingram Indus., 442 F.3d 1331, 1340 (Fed. Cir. 2006), the Court found disavowal of claim scope regarding the term "customer" where the "specification repeatedly reinforce[d]" a narrower scope than the proffered dictionary definition. Here, by contrast, there is at best only one isolated passage in the specification that even remotely supports narrowing the plain meaning of "protects." Under On Demand, that is insufficient. Similarly, in Intell-A-Check Corp v. AutoScribe Corp, 346 F. Supp. 2d 698, 709 (D.N.J. 2004), the court simply found that the patentee had disavowed coverage of a feature of the prior art that the specification explicitly criticized. Here, the specification criticizes the prior art for not providing *any* protection from moisture, not for its failure to completely eliminate the effect of moisture.

Defendants' claim construction should also be rejected because it would exclude the preferred embodiments from the scope of the claim. In columns 2 and 3, the '668

patent describes three preferred embodiments. The first two embodiments are depicted in figures 1 and 2 respectively, and the third embodiment is depicted in figures 3 and 4. The preferred embodiments in figures 1 and 2 show a container above a wick, with a wick hanging below the container and filling up the entire opening of the container. *See* '668 Patent, Peter Nikolai Aff. Ex. A. It is obvious from those two drawings and from the patent's description that the containers shown in figures 1 and 2 protect the wick, in the sense that they are above it and will cover or shield the wick from falling moisture. It would be equally obvious to the ordinarily skilled hunter that the container shown in figures 1 and 2 would not "eliminate" all falling moisture from contacting the wick.

Defendants' claim construction must be rejected because it would exclude these two preferred embodiments from the scope of the claim. The Federal Circuit has repeatedly made clear that excluding the inventor's preferred embodiment is "rarely, if ever, correct" and requires "highly persuasive evidentiary support." <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also* <u>Hoechst Celanese Corp. v. BP Chems. Ltd.</u>, 78 F.3d 1575, 1581 (Fed. Cir. 1996)("[I]t is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way.").

A hunter of ordinary skill, reviewing the patent, would quickly and easily come to the conclusion that "protects" means that the container has to "cover or shield" the wick; he or she would also fairly quickly and easily come to the conclusion that elimination of all moisture, in defendants' absolutist construction, is not required. After all, the patent repeatedly uses the term "protect" in an ordinary fashion, without any hint that "protects" really means "eliminate":

- In the abstract: "the scent wick is shaped to permit a substantial portion of the wick to fall out of the container to expose the scent wick while the container above *protects* the wick from falling moisture"

- In discussing the prior art, in column 1, l. 40-44: "many such prior art dispensers are complicated or simply do not *protect* the scent wick from harsh weather conditions, including wind, rain and snow, which will significantly affect the effectiveness of the scent dispersion."[3]

- Again in column 1, l. 50-51: "the container should provide cover and protection for the wick"

- In column 1, l. 64-67: "the scent wick is shaped to permit a substantial portion of the wick to fall out of the container to expose the scent wick while the container above *protects* the wick from falling moisture."

- In column 3, l. 42, while discussing the third embodiment: "Doors 82 protect the wick from falling moisture."[4]

One other court has faced an issue strikingly similar to the issue in this case, and that decision supports Wildlife Research's construction of the term "protects". In <u>Glaxo Wellcome v. Genentech</u>, 136 F. Supp. 2d 316 (D. Del. 2001), the court construed the language "*protect* the immunoglobulin from degradation" to mean that the invention must "*reduce* degradation"—not (as defendant proposed) "*substantially prevent* degradation." <u>Id.</u> at 338-39. The Court characterized this as the "plain meaning" of the term "protect,"

---

[3] Wildlife Research's patented device is not claiming to completely eliminate the effect of wind on scent dispersion in this passage, and the person of ordinary skill would understand that.

[4] Defendants make much of the fact that the patent uses the word "protects", with reference to the doors of embodiment 3, but does not specifically use the word in the detailed discussion of embodiments 1 and 2. The reason, however, is obvious, and not helpful to the defendants. The entire patent, including most of the claims, repeatedly discusses the "container" above the wick embodiments; this third embodiment, involving "doors", is structurally different.

id. at 339, despite a passage in the specification stating that the invention "virtually *eliminates* degradation."  Id. at 338-39.

This Court should construe the claim term "protects" to mean "to cover or shield," and should reject Defendants' construction changing the term "protects" to "eliminate."

## III.  THE COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

### A.  The Law of Infringement

There are two kinds of patent infringement:  "Literal" infringement and infringement under the "doctrine of equivalents."  Literal infringement means that the accused system contains elements identical to each element of the patent claim.  See, e.g., Litton Sys., Inc. v. Honeywell, Inc., 140 F.3d 1449, 1454 (Fed. Cir. 1998).  The doctrine of equivalents exists to prevent defendants from avoiding patents by making insubstantial changes to the invention.

Under the doctrine of equivalents, the plaintiff need not prove that the accused product has elements identical to the construed patent claim, but rather that it contains elements at least equivalent to each element of the asserted patent claim.  Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 40 (1997).  Equivalence is typically demonstrated through the familiar function-way-result test, in which the fact finder analyzes whether the accused product "performs substantially the same function in substantially the same way to obtain the same result."  Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3rd 1570, 1579 (Fed. Cir. 1995) (quoting Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950)).

**B.** **The Container of the Seal-Tite Drop Wick Product Protects the Wick From Falling Moisture**

Defendants' noninfringement argument is that the Seal-Tite Drop Wick container "provides no protection for the scent wick from falling moisture." Defs. Mem., p. 16. This statement, which defendants repeat several times, is demonstrably incorrect. As the testing performed by Wildlife Research's expert, Mr. Welbes, establishes, the container provides a very significant level of protection to the wick. At the realistic levels of rainfall tested, the container provides a dramatic level of protection and performs many times better than the bare, unprotected wick. See Welbes Dec. ¶¶ 22-24, 31 and Exs. 2-5. At the most typical rates of rainfall prevailing during hunting season, 0.3 inches or less per hour, the Seal-Tite Drop Wick performs *10 times better* than a bare wick. Id.

Thus, the fundamental factual predicate of defendants' motion has been proven wrong. Wildlife Research believes that Mr. Welbes' testing is conclusive. Under the proper construction of the term "protects," no reasonable jury could find for the defendants on this element, given the clear superiority and significant level of protection provided by the container of defendants' Seal-Tite Drop Wick product.

Even if the Court were to adopt the defendants' extreme position and rule that the word "protects" really means "completely eliminates falling moisture", the Court would still have to deny defendants' motion for summary judgment. At a minimum, there is a triable, genuine issue of material fact as to infringement under the doctrine of equivalents. Mr. Welbes' testing showed that, at ordinary, realistic levels of rainfall, the protected wick maintains almost 90% of its scent material, while the unprotected wick lost over 70%. Welbes Dec. ¶ 31 and Exs. 4-5.

A reasonable jury could certainly find that that level of remaining scent material is substantially equivalent and would be nearly as effective, in terms of dispersing scent material, as a wick for which all falling moisture had been "eliminated."  Moreover, it is important to keep in mind that the issue is whether the defendants' product infringes in actual, real-world conditions; Wildlife Research does not have to prove that the defendants' product infringes in extreme and unrealistic conditions.  See Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 859 (Fed. Cir. 1988); Doorking, Inc. v. Sentex Systems, Inc., 19 Fed. Appx. 872, 878-79 (Fed. Cir. 2001).

## IV.   THIS COURT SHOULD GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT OF CLAIMS 1 AND 7

Unlike in many patent cases, the '668 patent is straightforward and the structure described in the claims is not difficult to understand.  It is obvious, when one compares the defendants' Seal-Tite Drop Wick product to the language of claims 1 and 7, that the remaining elements of the patent claims are present.  To set it out in detail, the Seal-Tite Drop Wick product:

- Is a reusable hanging container and scent wick

- Has a container with a closed end with hanging means for supporting the container above the ground

- Has an opening into the container located on the bottom of the container

- Has a cap to sealably close the container

- Has a scent wick sized to fit within the container

- Has a scent wick shaped to permit a substantial portion of the wick to fall out of the container to expose the scent wick

- Has a container disposed above the scent wick, which, as detailed above, protects the wick from falling moisture

<u>See</u> Burgeson Dec. ¶ 9 and Ex. 4; *see* Welbes Dec. ¶¶ 22-24, 31 and Exs. 2-5; <u>cf.</u>

Harmston Aff. Ex. B to Nikolai Aff. Ex. A, claims 1 and 7.

Therefore, the only colorable infringement issue in this case is the one that

defendants have raised, relating to whether the container above the wick "protects" the

wick from falling moisture.  Mr. Welbes' testing establishes, beyond any legitimate

factual dispute, that the container does in fact protect the wick from falling moisture.

Plaintiff Wildlife Research thus respectfully requests that the Court grant its motion and

find that defendants' Seal-Tite Drop Wick products infringe Claims 1 and 7 of the '668

patent.

## **CONCLUSION**

Plaintiff Wildlife Research respectfully requests that the Court:

1.      Deny the defendants' motion to dismiss, and order the defendants to file an

answer immediately;

2.      Deny the defendants' motion for summary judgment of noninfringement;

3.      Adopt the claim construction of the term "protects" proposed by plaintiff

Wildlife Research; and

4.      Grant Wildlife Research's motion for summary judgment that defendants'

Seal-Tite Drop Wick product infringes Claims 1 and 7 of the '668 patent.

Respectfully submitted:

Dated:  January 22, 2007

DORSEY & WHITNEY LLP


By s/Bart B. Torvik
     J. Thomas Vitt #0183817
     Bart B. Torvik #335289
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

Attorneys for Plaintiff